# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

```
DONALD E. HARNEY,            )
                             )
Plaintiff,                   )
                             )
vs.                          )        NO. 2:04-CV-131
                             )
MAYOR THOMAS McDERMOTT, JR., )
et al.,                      )
                             )
Defendants.                  )
```

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment filed by Defendants, City of Hammond and Mayor Thomas McDermott, Jr., on December 29, 2005. For the reasons set forth below, the motion is **GRANTED**. The Clerk is **ORDERED** to **DISMISS** Count I of Plaintiff's complaint **WITH PREJUDICE**, and the remaining counts **WITHOUT PREJUDICE**.

BACKGROUND

In the City of Hammond's 2003 mayoral election, Thomas McDermott, Jr. ("McDermott") defeated incumbent Mayor Dedelow ("Dedelow"). McDermott then terminated Plaintiff, Donald E. Harney ("Harney"), from his position as general foreman of the Hammond Recycling Department. Harney claims he was terminated due to his active support of Dedelow,

in violation of his First Amendment right to free speech. McDermott, however, claims the termination was a permissible political firing. Harney also alleges that he was not paid all wages due upon his termination.

Harney's complaint, filed on March 29, 2004, alleges retaliation for exercising his First Amendment rights pursuant to 42 U.S.C. section 1983 (Count I); a claim pursuant to Article I, sections 9, 21, and 21, and Article II, section I of the Indiana Constitution (Count II); retaliation under Indiana common law (Count III), and a violation of Indiana Wage Payment Statute, Indiana Code section 22-2-5-1, *et. seq.* (Count IV).

In the instant motion for summary judgment, Defendants argue that, as a matter of law, Plaintiff's complaint must be dismissed in its entirety.

DISCUSSION

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar*

*Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of

-3-

material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be "'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Northern Indiana Local Rule 56.1(a) provides that:

> [a]ny party opposing the motion [for summary judgment] shall, within thirty (30) days from the date such motion is served upon it, serve and file any affidavits or other documentary material controverting the movant's position, together with a response that shall include in its text or appendix thereto a "Statement of Genuine Issues" setting forth, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence, all material facts as to which it is contended there exists a genuine issue necessary to be litigated.

Failure to do so results in the court assuming that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy. N.D. Ind. L. R. 56.1(b).

Harney has failed to submit a proper response to Defendants' Motion for Summary Judgment as required by Local Rule 56.1(a). Although Plaintiff's response brief does contain a section titled "Statement of Genuine Issues", it contains no citations and reads more

like a summary of the argument than a recitation of the facts on which there is a genuine issue of material dispute. Nonetheless, Plaintiff's response brief also contains a section titled "Standard and Facts" which includes facts together with citations to the record. The facts contained in this section, although not responsive to Defendants' statement of material facts, have nonetheless been considered in determining what facts this Court will accept as true for purposes of the instant summary judgment motion. The facts are as follows:

Harney, who has only a GED, worked as a mechanic for USA Muffler Shops prior to his employment with the City of Hammond. (Harney Dep. at 4.) Harney began working for the City of Hammond as a garbage collector. (*Id.*) He then transferred to the recycling department, and was subsequently promoted to the position of foreman in the processing center. (Harney Dep. at 4-5.) Later, he was promoted to general foreman of the recycling department, a position he served in until his termination. (Harney Dep. at 5.)

Harney was an active supporter of McDermott's political challenger, incumbent Mayor Dedelow. (Harney Dep. at 32; Complaint ¶ 13.) Harney walked door to door for Dedelow, put up signs, and sold fund-raising tickets for Dedelow's campaign. (Harney Dep. at 33.) Although McDermott denies knowledge of Harney's campaign activities and political affiliations (McDermott Dep. at 81-82), for purposes of this order, the Court gives Plaintiff the benefit of the doubt and

assumes that McDermott both knew of Harney's political activities, and that his firing was motivated at least in part by Harney's political activities.

As general foreman, Harney reported to the director of the department, Barbara Hooper ("Hooper"). (Harney Dep. at 19; Def.'s Ex. B.)  Hooper, in turn, reported directly to the mayor. (Hooper Dep. at 52; Def.'s Ex. B.)  It is undisputed that there was a political component to Hooper's job and that Hooper was a policy maker subject to political firing.  (Hooper Dep. at 27-28, 37-38; Harney Dep. at 60.)  Hooper, also terminated, does not contest McDermott's authority to terminate her.  (Hooper Dep. at 27-28.)

A job description for general foreman of the Hammond Recycling Department contained in Harney's personnel file and marked "Gave Don a copy 7-21-97" provides the following:

> WHAT IS EXPECTED: A General Foreman must have a high school diploma or equivalency (G.E.D.) certificate and at least five years of management experience.
>
> A General Foremen's [sic] first and foremost responsibility is to have good management skills and assist the director with departmental duties. A General Foreman is expected to oversee daily routine duties of the employees and keep documented record of their attendance and working performance.
>
> The General Foreman is responsible for training employees under him in all areas of departmental operations and scheduling their workday to insure collections and processing of materials are completed in an efficient and timely manner.  The General Foreman must have general knowledge of route vehicles and processing equipment

maintenance schedules and service contracts.

The General Foreman oversees the processing center's personnel and building. He records all weights of materials and arrange [sic] for their procurement of sale from brokers and records weights. The General Foreman shall perform duties as required and requested by the director and fill in his/her absence.

(Ex. L.)

Harney and Hooper testified at their depositions that they did not remember seeing the general foreman job description before. (Harney Dep. at 30-31; Hooper Dep. at 6-8, 13.) Hooper testified she did not prepare the job description, and that Harney did not perform all of the functions listed in the description. (Hooper Dep. at 6-7.) Some of the tasks, specifically dealing with brokers, were performed by Hooper herself. (Hooper Dep. at 7, 11-12.) Hooper also testified that the management experience requirement did not apply to Harney. (Harney Dep. at 10-11.) Otherwise, Hooper testified that the job description was accurate and that Harney's job duties included many things that were not included in the job description. (Hooper Dep. at 12-13.)

Although the job description is now a key document relied upon by Defendants to show that this was a policymaking position, this document was not relied upon by McDermott or his attorney at the time the decision was made to terminate Harney. (Smith Dep. at 3-5, 25-26.) Kevin Smith, the attorney who advised McDermott regarding who could be lawfully terminated, testified that he did not request or

receive personnel files, specific job descriptions regarding any employees, or other documentation describing the specific duties and responsibilities of any employees. (Smith Dep. at 22-23, 26.)

Harney was second in command of the recycling department. (Harney Dep. at 19; Hooper Dep. at 21-24; Def.'s Ex. B.) Harney supervised everyone except the director, and the director's secretary. (Harney Dep. at 19, 70.) The department had only 16 employees in total. (Harney Dep. at 70.) Although it is undisputed that Harney was second in command of the department, the parties dispute the degree to which Harney actually operated as second in command. Harney claims that if Hooper was gone, he was required to either contact Hooper, or contact the City Attorney prior to taking certain actions. (Harney Dep. at 19-20.) Additionally, Harney claims that he was not privy to all of Hooper's duties when she was gone.[1] (Harney Dep. at 29.)

Harney conceded that he would fill in for Hooper when she was absent, but claims that he did not have authority to do everything Hooper did. (Harney Dep. at 29, 31-32.) Hooper also conceded that Harney filled in when she was absent. (Hooper Dep. at 12-13.) Hooper, as director of the department, received five weeks of vacation per

---

[1] Harney also claims that when he expressed his opinions to Hooper, his opinions received no greater weight than any other employees. Harney cites to his deposition to support this, but the cited portion of the record does not support this claim, and it is therefore disregarded. (*See* Memorandum in Opposition to Defendants' Motion for Summary Judgment at 3-4, citing Harney Dep. at 21-22.)

year, and was also absent from the office for business related travel a couple times per year. (Hooper Dep. at 47-50.)

Despite being second in command, Harney minimizes the scope of his duties by noting that he was not authorized and did not ever fire anyone, he did not have the right to send employees home[2], and that he had to get Hooper's approval before taking anyone's time away. (Harney Dep. at 40-41.) Harney claims he spent most of his days repairing equipment. (Harney Dep. at 40.) Harney was an hourly employee and recorded his time by a time clock. (Harney Dep. at 76.) Harney was the only hourly employee terminated as a result of the change in administrations. (Harney Dep. at 76).

When Hooper was not available, Harney was encouraged to attend meetings. (Hooper Dep. at 52.) He has attended (either with or without Hooper) Mayoral staff meetings, board of works meetings, Lake County Solid Waste Board meetings, and a meeting at the Chicago Board of Trade to which the press was present. (Harney Dep. at 66, 98-99, 69, 98.) Harney notes that on other occasions when Hooper was not available for staff meetings, Hooper would send low level employees, such as drivers, in her place. (Harney Dep. at 66-67.)

Although Harney was a member of the union for a time while he held the position of general foreman, the union and city decided in

---

[2]Hooper testified that Harney did have this authority, he just chose not to exercise it. (Hooper Dep. at 66.) However, for purposes of this motion, this Court accepts Harney's claim that he lacked this authority as true.

the mid to late 1990's that foremen should not be union members due to the potential conflict created by the fact that union rules prevented a union member from disciplining another union member. (Harney Dep. at 23-24; 100.)  When this change took place, Harney was advised by then city attorney, Denise Senja, that the change would not subject him to political firing. (Harney Dep. at 100.)

Harney implemented numerous projects. (Harney Dep. at 53; Def.'s Ex. N.)  Some of these projects reflected favorably on Mayor Dedelow. (Harney Dep. at 55.)  Harney worked with consultants to create an emergency safety policy for the department.  (Hooper Dep. at 53-54, 73.)  He was responsible for developing new waste reduction goals. (Hooper Dep. at 70.)  Harney worked with other department heads in abatement of the storm sewers, as part of the West Nile Virus Program. (Hooper Dep. at 72.)

Harney admits he was involved in a project regarding route restructuring. (Harney Dep. at 45.)  The project involved coordination with people from the sanitation department to come up with a better street route system to make the drivers more efficient.  (Harney Dep. at 45-47.)  Harney put the maps together, utilizing his computer skills.  (Harney Dep. at 48.)

Defendants claim that Harney was in charge of building the new recycling center.  (Br. in Supp. of Def.'s Mot. for Summ. J. at 3, citing Harney Dep. at 57-58 and Hooper Dep. at 28.)  However, the record does not support this claim to the extent alleged by

Defendants.  Harney indicates that, while he was on the job site when they were building the recycling center, his role was to watch and see what was going on.  (Harney Dep. at 58.)  He played no roll whatsoever with regards to financing or budgetary things regarding the building. (Harney Dep. at 58.)

The recycling department was in the public spotlight, and there was undoubtedly a political component to Hooper's job.  (Hooper Dep. at 37-41.)  Informational brochures were sent out which were designed in part to show the mayor's support for the recycling program, by either including the mayor's picture or favorable comments by the mayor.  (Hooper Dep. at 41-43.)  The mayor publically recognized both Hooper and Harney.  (Hooper Dep. at 64-65.)

Harney was permitted to speak on behalf of the department, if it was with regards to a matter he was involved in.  (Hooper Dep. at 45; Harney Dep. at 57.)  And, in fact, Harney is quoted in numerous newspaper articles regarding the Recycling Department.  (Harney Dep. at 59-60; Def.'s Exs K, P, Q & R.)  Harney claims that, with regards to speaking to the press, he had the same authority given to all recycling department employees by Hooper, but the cited portion of the record does not support this claim.  (*See* Mem. in Opp'n to Defs.' Mot. for Summ. J. at 6, citing Harney Dep. at 59-60.)  Hooper testified that Harney was allowed to speak to the press if the subject had something to do with him.  (Hooper Dep. at 44-46.)  But, as second in command, Harney was involved in many, many things, and there was thus

very little that Harney was not authorized to speak about. Hooper also testified that she, and no one else, was authorized to *officially* speak on behalf of the recycling department. (Hooper Dep. at 44.)

Despite Hooper's broad description of the tasks Harney performed, Hooper did not view Harney as a policy maker. (Hooper Dep. at 17-18.) She refers to Harney as gifted in mechanics, electrical carpentry, welding and related matters, and utilized these wide ranging gifts to assist the efficient operation of the center. (Hooper Dep. at 28.) In Hooper's words, "Don's talents and knowledge of being our General Foreman has made our department one of the most progressive in the city." (Hooper Dep. at 74.) Harney admits he functioned as the "quarterback" on the recycling department team. (Harney Dep. at 40.)

It is undisputed that Denise Senja, the city attorney under Mayor Dedelow, was of the opinion that Harney's position was not subject to political firing. (Harney Dep. at 99). It is also undisputed that Attorney Kevin Smith, who worked with the McDermott administration to facilitate the transition, was of the opinion that Harney's position was subject to political firing. (Smith Dep. at 28.)


Retaliation for Exercising First Amendment Rights

On the record before this Court, it appears that McDermott's decision to terminate Harney was likely imprudent. Harney's supervisor, who was also terminated, had the following to say about Harney's termination:

> . . . I could understand why I was terminated
> because I did not support the present
> administration and it was well and he had every
> opportunity to get rid of me.  He had every right
> to get rid of me.  Don though had all the
> experience to run, he had all the ability and
> experience to run that center as far as, you
> know, having the knowledge of that center, you
> know, he had all of the capabilities of knowing
> how to run that, how all that machinery is run he
> worked very well with the employees, he just
> didn't do – I don't think – I was just really
> surprised that when he was replaced he was
> replaced with a person that had no – no knowledge
> at all of how to change oil in a baler, she knew
> nothing about this, the person that replaced me
> had a little bit of environmental knowledge, but
> that woman that replaced him had no knowledge of
> any kind of electrician, or I wouldn't – it just
> blew my mind.
>                     . . .
> it was so foolish to take someone as tall-ended
> as him and replace him with a person that
> absolutely knew nothing about mechanics, or
> electricians, or carpentry, or welding, this man
> did everything like that in our center, he even
> worked with the architect to build the center.
> He had, for some reason God gave him a gift to
> figure out all this stuff . . .

(Hooper Dep. at 27-28.)  Unfortunately for Harney, his termination was just as surprising to him as it was to Hooper.  This Court, however, is not called upon to determine whether McDermott made a wise decision in terminating Harney.  Rather, this Court must consider the more difficult question of whether the decision to terminate Harney violated his First Amendment right of free speech.

Plaintiff must show that his political activity was a motivating factor in the decision to discharge him from his position.  *See Selch v. Letts*, 5 F.3d 1040, 1042 (7th Cir. 1993); *Nelms v. Modisett*, 153

F.3d 815, 818 (7th Cir. 1998). After this showing is made, the burden shifts to Defendants to show that "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Selch*, 5 F.3d at 1042 (quoting *Branti v. Finkel*, 445 U.S. 507 (1980)).

As noted previously, for purposes of this motion this Court assumes that Harney has made an adequate showing that his political activity motivated his discharge. However, it is noted that McDermott has denied knowledge of any of Plaintiff's political activity or ties. And, Plaintiff has produced no evidence to the contrary. Although Plaintiff cites to a variety of other individuals who had knowledge of Plaintiff's political activity (Harney Dep. at 35-39), he has not shown that any of that knowledge was passed on to McDermott.

While this Court suspects Plaintiff's failure to produce adequate evidence that his discharge was motivated by his political activity, in and of itself, could provide a separate and distinct basis for granting the instant summary judgment motion on Plaintiff's claim of retaliation under the First Amendment, this Court need not decide that issue today. That is because there is no genuine issue of material fact with regard to whether party affiliation is an appropriate requirement for the effective performance of the public office involved.

"The question of whether a position is exempted from the First

Amendment patronage dismissal ban is a factual one that should ordinarily be left for a jury to determine." *Pleva v. Norquist*, 195, F.3d 905, 912 (1999) (citing *Matlock v. Barnes,* 932 F.2d 658, 663-665 (7th Cir. 1991) and *Soderbeck v. Burnett County, Wis.*, 752 F.2d 285, 288-89 (7th Cir. 1985)). But, this is not an absolute rule. "[I]n some cases, the duties and responsibilities of a particular position are clearly outlined by law. In these cases, the court may make the determination, as a matter of law, that a certain position involves policymaking." *Id*. at 912 (citing *Warzon v. Drew*, 60 F.3d 1234, 1240 (7th Cir. 1995) and *Heck v. City of Freeport*, 985 F.2d 305, 310 (7th Cir. 1993)).

As stated by the Seventh Circuit recently,

> The Supreme Court has held in the name of freedom of speech that a public official cannot be fired on the basis of his political affiliation unless the nature of his job makes political loyalty a valid qualification; this could be either because the job involves the making of policy and thus the exercise of political judgment or the provision of political advise of the elected superior, or because it is a job (such as speechwriting) that gives the holder access to the political superiors' confidential, politically sensitive thoughts.

*Riley v. Blagojevich*, 425 F.3d 357, 359 (7th Cir. 2005) (citing *Elrod v. Burns*, 427 U.S. 347, 367-68 (1976); and *Branti v. Finkel*, 445 U.S. 507, 518 (1980)). In other words, "[p]olitical affiliation is an appropriate criterion for public employment when the effective operation of government would be compromised by requiring a public official to retain a potential political enemy in a position of

responsibility." *Pleva v. Norquist*, 195 F.3d 905, 912 (7th Cir. 1999). The test to determine whether a position is protected or not has been articulated by the Seventh Circuit as follows: "whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981). The Government bears the burden of demonstrating its need is sufficient to exempt a position from the patronage dismissal ban. *Elrod*, 427 U.S. at 368.

While the law is clear, its application has been fraught with difficulty. In *Riley*, the Seventh Circuit noted that drawing the line between protected and unprotected positions is "inescapably arbitrary." *Riley*, 425 F.3d at 359. This makes it difficult for a newly-elected official to determine who can and who cannot be replaced. *Id.* Noting this dilemma, the Seventh Circuit stated that:

> It seems to us that if no basis is presented for thinking the official job descriptions systemically unreliable in a sense to be explained, the elected officials can rely on them, even if a plaintiff is prepared to testify (self-servingly) that the job description doesn't actually describe what he does, thus precipitating a factual inquiry likely to be protracted and inconclusive. Our focus is on the 'inherent powers' of the office, not what any individual officeholder actually does . . . . Otherwise, the courts -and the elected officials- would have the burden of having to re-examine a certain position every time a new administration changes the mix of responsibilities bestowed upon the officeholder.

*Id.* at 360-61 (internal quotations and citations omitted). Accordingly, the Seventh Circuit has instructed that the court should inquire of the reliability of the job description. *Id*.

In this case, Defendants contend that Harney's position was a policymaking position, and that he was also a confidential employee. To support their claim that Harney is a policymaker, Defendants rely upon a job description that both Harney and Hooper claim they do not recall seeing. But, the description is marked as having been given to Harney on July 21, 1997, and neither Harney nor Hooper offered any alternative job description. In fact, Hooper has testified that it is more or less accurate - and, if anything, underplays the extent of Harney's duties. Under these circumstances, this Court finds that the job description is sufficiently reliable to be used by this Court as an aid to determining the inherent characteristics of Harney's position.[3]

Harney held a high level position. He was second in command to someone who was undoubtedly a policy maker. Harney's job description provides that he is in charge when Hooper is gone, and Hooper had

---

[3]Another interesting twist on the job description now relied upon by the Defendants is that these Defendants did not actually use this job description when making the decision to terminate Harney. Nonetheless, the Seventh Circuit has made it clear that this Court is to look to the inherent characteristics of the position, not what the plaintiff actually did. *Riley*, 425 F.3d at 360-61. Thus, the fact that the Defendants did not actually rely on the job description when making its decision is irrelevant where the description correctly reflects the inherent characteristics of the position.

significant amounts of vacation time each year that kept her out of the office (as does the new director).  And, the director also has business-related travel that keeps her out of the office.  Thus, there is considerable time where the second in command is filling in for the director.

Although Harney may have only a GED, and climbed through the ranks in his employment with the City of Hammond, he was nonetheless second in command of the department.  Harney claims that he was only second in command to an extent - and that he lacked knowledge and authority to fulfill all of Hooper's duties.  This reflects what actually happened in the office, not the inherent authority of the position, and is not the proper focus of the Court.  *See Riley*, 425 F.3d at 360-61.

The fact that Harney was merely second in command, and that he may not have fulfilled every task performed by the director does not protect his position.  In *Tomczak v. City of Chicago*, the Seventh Circuit Court of Appeals held that a city employee holding the second highest position in the water department was exempt from the prohibition against patronage dismissals.  765 F.2d 633 (1985).  "[A]n employee is not protected merely because he is a subordinate within his own office.  It is sufficient that an officeholder is responsible for implementing policies that derive from partisan decision made by others."  *Hadfield v. McDonough*, 407 F.3d 11, 18 (1st Cir. 2005).

In fact, the job description demonstrates that Harney's inherent

powers were open-ended.  The description says Harney was to "perform duties as required and requested by the director".  "Open-ended responsibilities are a telltale sign that the position includes a policy implementing function."  *Hadfield*, 407 F.3d at 17.  "An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position . . . [C]onsideration should also be given to whether the employee acts as an advisor or formulates plans for the implementation of broad goals."  *Elrod*, 427 U.S. at 368.

Here, the scope of Harney's responsibilities is very broad.  It is undisputed that Harney had authority to speak for the recycling department, at least as to matters he was involved in.  And, as second in command, he was involved in quite a few matters.  Furthermore, the record includes several examples showing that Harney has exercised this authority periodically over the years.  He also attended meetings on behalf of the department on numerous occasions.  The fact that others also did so occasionally  does not undercut the importance of this function.

Furthermore, Harney was removed from the union so that he could exercise his authority to discipline other members of the department without conflict.

Although Harney notes that he is paid hourly rather than on a salaried basis, and that he punches a time clock, Harney has failed to cite any authority that would show that this is dispositive of the

issue, and this Court is aware of none.

Harney asks this Court to consider the fact that he spends most of his time repairing equipment. But, again, the proper inquiry is the "inherent" nature of the position, not how Harney himself actually spends his time. Thus, this fact is not key to resolving the issue before this Court.

On the record before this Court, this Court finds that Harney was a policymaker, and that there is no genuine issue of material fact with regard to whether party affiliation is an appropriate requirement for the effective performance of the public office involved. The fact that this came as a surprise to Harney (and others) does not alter this.

With regards to the claim that the position is a confidential one, Smith testified that was not the basis for the decision. While there is perhaps an argument that, because the Court must look to the inherent nature of the position, Smith's basis for reaching his conclusion is irrelevant, this Court need not decide that issue in light of the Court's finding that the position is a policy-making position.

Because this Court finds that Harney's first amendment claim must fail, it need not address McDermott's claim that he is entitled to qualified immunity.

Indiana State Law Claims.

The claims that remain for the Court to consider are Plaintiff's state law claims for violation of Article I, section 9, 21, and 21, and Article II, section I of the Indiana Constitution (Count II); retaliation under Indiana common law (Count III), and a violation of Indiana Wage Payment Statute, Indiana Code section 22-2-5-1, *et. seq.* (Count IV). Upon due consideration, these claims are **DISMISSED WITHOUT PREJUDICE** because the federal claim has been dismissed prior to trial. *Groce v. Eli Lilly & Co.,* 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

<u>CONCLUSION</u>

For the reasons set forth above, this motion is **GRANTED.** The Clerk is **ORDERED** to **DISMISS** Count I of Plaintiff's Complaint **WITH PREJUDICE,** and the remaining counts **WITHOUT PREJUDICE.**

**DATED: June 2, 2006**  **/s/RUDY LOZANO, Judge**
  **United States District Court**